# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TROY D. PRICE, JR.     :

           :

           :

  v.        :    Civil No. CCB-11-1735

           :

           :

ATLANTIC RO-RO CARRIERS, et al. :

## MEMORANDUM

Plaintiff Troy D. Price, Jr. seeks relief from defendants Atlantic Ro-Ro Carriers, Inc., Mos Shipping. Ltd., and Baltic Mercur Joint Stock Co. under section 905(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.* ("LHWCA"). Price alleges that defendants' negligence resulted in his personal injuries aboard the M/V Valga. The parties have filed three separate motions for summary judgment: (1) defendants move collectively for partial summary judgment, arguing that section 11-108 of the Maryland Code's Courts and Judicial Proceedings Article applies to Price's claim, limiting his prospective noneconomic damages to $695,000; (2) Atlantic Ro-Ro Carriers, Inc. ("ARRC") moves for summary judgment, alleging that it had no duty to Price under section 905(b); and (3) third-party defendant, The Rukert Terminals Corporation ("Rukert"), moves for partial summary judgment, maintaining that defendants' impleader under Rule 14(c) was improper. For the reasons set forth below, the motions will be granted in part and denied in part.

## BACKGROUND

On August 19, 2008, Troy D. Price, Jr., a longshoreman employed by Beacon Stevedoring Corporation, an affiliate of The Rukert Terminals Corporation, was injured aboard the M/V Valga. Owned and operated by Mos Shipping. Ltd. ("Mos") and Baltic Mercur Joint

Stock Co. ("Baltic"), the Valga was moored at a pier in one of Rukert's terminals, where Beacon's harbor workers loaded and unloaded its cargo.

Prior to August 2008, the Valga arrived in Baltimore on a monthly basis transporting cargoes arranged by ARRC, the commercial manager under contract with the vessel's owner. Pursuant to its agreement with Mos, ARRC's role as the Valga's commercial manager required it to negotiate employment, or cargoes, for the vessel; coordinate the vessel's voyages; and appoint stevedores in locations where the vessel found work.  (Shannon Decl. Ex. 1, Management Agreement 11, ECF No. 74.)  ARRC's responsibilities under the agreement, however, did not extend to the technical management of the Valga, or to the management of its crew.  (*Id.*)  To oversee the loading and unloading of the Valga's cargo in Baltimore, ARRC's "port captain," Vadim Belyakov, routinely joined the vessel upon its arrival at Rukert's terminals, where he checked the condition of the cargo and communicated with both the stevedores and the crew regarding the operation's logistics.  (Belyakov Dep. 11:18-21, 14:14-21, 15:1-8, ECF No. 71-2.) According to Belyakov, while the stevedores worked aboard the vessel, he would split his time between the pier and the Valga.  When aboard the Valga, he conducted business from a computer in a private cabin, separated from the decks where the longshoremen discharged the cargo.  (*Id.* at 31:5-19.)

On the day of the accident, Price placed cargo onto the elevator lift in the lower "hold" of the Valga, while a fellow harbor worker, Elliott Nichols, operated a forklift on the upper "tween" deck.  Used to raise cargo from the hold to the tween, the elevator lift left a large open "hatch" in the upper deck when lowered back to the hold.  The lift was manned by Alexandr Nosov, the Valga engineer responsible for operating the elevator lift and for directing the stevedores to evenly distribute cargo on its platform.  (Price Dep. 47:5, ECF No. 77-1.)

After several hours of operations on August 19, fluid—likely from a hydraulic leak in one of the forklifts—began to accumulate on the tween level and remained, despite being visible to the stevedores and crew.  (Nichols Dep. 51:17-18, 108:22, 109:1-5, ECF No. 77-3).  When Nichols subsequently attempted to maneuver his forklift around the open hatch, the forklift's brakes malfunctioned and its wheels began to skid on the slippery deck.  (*Id.*)  Nichols lost control of the machinery and jumped off the forklift, which then fell through the open hatch and struck Price, who was working in the hold below.  Price's leg was severely injured as a result. Nichols, Price, Nosov, and several other stevedores at the work site witnessed Price's accident. (Nosov Dep. 43:18-21, ECF No. 77-2.)  Belyakov did not.

Although Price, Nichols, and Nosov disagree about whether safety cones and painted lines surrounded the hatch's opening, they all agree that the platform lacked surrounding metal guardrails, which, according to Belyakov and Nosov, would have impeded the stevedores' ability to remove the cargo from the elevator lift.  (*Id.* at 34:20-22, 35:1.)[1]  Belyakov, however, was not on the tween deck when the accident occurred, and arrived only after being summoned by the Valga's captain.  (Belyakov Dep. 32:1-8.)  ARRC did not investigate the accident or its causes and was not involved in any formal probe conducted by Mos, or by Rukert and Beacon.  (*Id.*)

On May 20, 2011, Price filed a complaint in the Circuit Court for Baltimore City alleging that Mos, Baltic, and ARRC negligently permitted the Beacon stevedores to operate forklifts at a high rate of speed around the open and unprotected hatch, failed to rectify the hazard caused by the fluid on the tween deck, and did not properly safeguard the opening in the tween deck.  In his complaint, Price claimed damages under the general maritime law and section 905(b) of the

---

[1] Nichols testified that there were no safety cones surrounding the hatch.  (Nichols Dep. 59:15 ("We didn't even have safety cones.").)  Price and Nosov testified that there were safety cones but no guardrails.  (Price Dep. 57:6-21 ("Now, around the perimeter of that opening, when you were working in the tween deck that day, were there any orange cones laid along along the perimeter of the opening? / Yes.").)  Belyakov also testified that as a matter of practice, cones but not guardrails were installed during every cargo operation involving the elevator lift and open hatch.  (Belyakov Dep. 26:20-21, 27:1-17.)

LHWCA.  On June 23, 2011, defendants removed the suit to this court on the basis of diversity jurisdiction and subsequently impleaded Rukert as a third-party defendant.

For his section 905(b) claim, Price seeks damages for pain and suffering in addition to damages for loss of earnings.  Because his claim arises under federal maritime law, he maintains that his pain and suffering damages are not subject to Maryland's cap on noneconomic loss.  Defendants disagree and moved for partial summary judgment on August 30, 2013.

Meanwhile, employing Rule 14(c) of the Federal Rules of Civil Procedure, defendants filed a third-party complaint against Rukert, alleging that, although Beacon was the formal employer of the stevedores, Rukert was responsible for both maintaining the forklifts used by longshoremen aboard the Valga and training harbor workers in the correct use of machinery.  By failing to meet these duties, Rukert allegedly breached its contract with defendants and contributed to Price's injury.  Consequently, defendants counterclaimed for both indemnity or contribution and a judgment against Rukert on behalf of Price.  Challenging defendants' use of Rule 14(c), Rukert moved for partial summary judgment on November 18, 2013.

Finally, rejecting Price's claim that ARRC is liable under a theory of vessel negligence, ARRC moved for summary judgment on January 16, 2014.  According to ARRC, its limited control over the Valga and the stevedores' operation constrained its duties under section 905(b).

The issues raised by the pending motions were argued at a hearing on July 10, 2014.

## STANDARD

According to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion: "By its very terms, this standard provides that

the mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must set forth specific facts

showing that there is a genuine issue for trial." *See Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P.

56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant,

and draw all inferences in her favor without weighing the evidence or assessing the witnesses'

credibility." *See Dennis v. Columbia Colleton Medical Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir.

2002). The court must, however, also abide by "the affirmative obligation of the trial judge to

prevent factually unsupported claims and defenses from proceeding to trial." *See Bouchat*, 346

F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation

marks omitted).

## ANALYSIS

### I.  Price's Damages for Pain and Suffering Under Section 905(b)

Although defendants acknowledge that Price's section 905(b) claim arises under federal

maritime law, they urge the court to apply Maryland's cap on noneconomic damages in personal

injury suits. Md. Code, Cts. & Jud. Proc. § 11-108. Though I am mindful of the Supreme

Court's warning to avoid "seeking out conflicts between federal and state regulation where none

clearly exists," *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446 (1960), after

evaluating the scope of the federal and Maryland rules, I disagree with the defendants. For the

reasons explained below, I conclude that Maryland's cap on damages for pain and suffering does not apply to Price's negligence claim under section 905(b).

Courts have permitted state law to supplement federal maritime law in certain circumstances. *See, e.g.*, *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 214-16 (1996) (acknowledging "gap-filling" role of state law); *Princess Cruises, Inc. v. General Elec. Co.*, 143 F.3d 828, 834 (4th Cir. 1998) (accepting supplemental use of state law in maritime suits in absence of applicable federal statute or well-established rule of admiralty); *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981) ("[A]dmiralty law, at times, looks to state law . . . to supply the rule of decision where there is no admiralty rule on point."). But such supplementation is subject to limits. A state law does not displace federal maritime law if it (1) "contravenes the essential purpose expressed by an act of Congress," (2) "works material prejudice to the characteristic features of the general maritime law," or (3) "interferes with the proper harmony and uniformity of [the general maritime] law in its international and interstate relations." *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 216 (1917). Although section 11-108 does not conflict with LHWCA's essential purpose, it both materially prejudices maritime law's treatment of noneconomic damages and interferes with maritime law's uniform application. Accordingly, section 11-108 does not apply to Price's section 905(b) claim.

## A. Conflict With LHWCA's Essential Purpose

The parties do not dispute that Price's section 905(b) claim would preclude any state law claim he might otherwise assert against the vessel. *See* § 905(b) ("The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."); *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 818 (2001) (noting that "LHWCA expressly pre-empts all other claims" as to employer and vessel).

Defendants argue instead that Maryland law may still supply the rule of decision regarding damages under section 905(b).

In drafting section 905(b), however, Congress did not create a new federal tort. Rather, section 905(b) codified the existing tort of maritime negligence, which courts have recognized for over a century. *See Garris*, 532 U.S. at 820; *Richendollar v. Diamond M Drilling Co.*, 819 F.2d 124, 125 (5th Cir. 1987) ("We reiterate today that when it enacted § 905(b), Congress did not create a new or broader cause of action in admiralty than that which previously existed, but rather, it curtailed available third party tort actions, and in doing so it neither expanded nor constricted maritime jurisdiction." (citations omitted)). As a result, although Congress indicated that section 905(b) should develop as a matter of uniform federal maritime law rather than as a piecemeal amalgamation of state tort law, it did not "specify the acts or omissions of the vessel that would constitute negligence." *Scindia Steam Nav. Co., v. De Los Santos*, 451 U.S. 156, 165 (1981). Instead, it relegated the elements of a section 905(b) action to the federal courts, to be worked out "through the application of accepted principles of tort law and the ordinary process of litigation." *Gravatt v. City of New York*, 226 F.3d 108, 117-18 (2d Cir. 2000) (quoting H.R. Rep. No. 92-1441 (1972), 1972 U.S.C.C.A.N. 4698, 4704).

In this respect, the LHWCA differs from other federal maritime statutes. Whereas Congress explicitly denoted the type—and in some cases, measure—of damages available under the Death on the High Seas Act ("DOHSA") and the Jones Act, it failed to cabin the damages recoverable under section 905(b). *Compare* 46 U.S.C. § 30303 (limiting DOHSA plaintiffs to pecuniary damages), *and* 46 U.S.C. § 30104 (incorporating the Federal Employers Liability Act into the Jones Act), *with Wheelings v. Seatrade Groningen, BV,* 516 F. Supp. 2d 488, 496 (E.D. Pa. 2007) (noting Congress's failure to limit recovery under section 905(b)). Accordingly,

Maryland's cap on pain and suffering damages does not automatically conflict with the LHWCA.

### B.  Material Prejudice to Characteristic Features of the General Maritime Law

According to Price, it is a characteristic feature of the general maritime law that an injured maritime plaintiff may fully recover his damages, subject only to the limitations imposed by federal law.  Maryland section 11-108, however, imposes a cap on pain and suffering damages.  Because general maritime law imposes no such ceiling, and because federal courts have acknowledged the need for a fact-specific analysis of pain and suffering damages in maritime injury suits, Price argues Maryland's uniformly-applied cap materially prejudices a characteristic feature of federal maritime law and thus cannot be applied to his negligence claim.

This court begins, therefore, with maritime law's treatment of noneconomic damages— and, in particular, damages for pain and suffering.  Although federal courts have long debated whether general maritime law permits recovery for punitive damages or loss of consortium, there is no dispute that, within the Fourth Circuit, a maritime plaintiff may recover damages for pain and suffering.  *See Greene v. Vantage S.S. Corp.*, 466 F.2d 159, 166-67 (4th Cir. 1972) (holding that pain and suffering damages are recoverable under general maritime law).  Federal law does not, however, provide a formula or guideline for calculating damages, nor does it impose a cap on the amount plaintiffs may recover.  *See id.* at 164, 166.  Absent further guidance, in cases of maritime injuries, damages for pain and suffering have hinged on the particular facts of each case.  *See, e.g.*, *Hernandez v. M/V Rajaan*, 841 F.2d 582, 590-91 (5th Cir. 1988) (affirming an award of $1,000,000 in pain and suffering for a longshoreman rendered paraplegic and noting that each award for pain and suffering "depends heavily on its own facts"); *see generally* Thomas J. Schoenbaum, 1 Admiralty & Mar. Law § 5-16 (5th ed. 2013).

Under Maryland section 11-108, by contrast, noneconomic damages may not exceed $500,000, plus an additional $15,000 for every year after 1995. Under this rule, noneconomic damages exclude punitive damages, but encompass damages for pain and suffering, inconvenience, physical impairment, disfigurement, and loss of consortium. Here, application of section 11-108 would limit Price's prospective damages for pain and suffering to $695,000.

Thus far, only two federal courts have considered whether a state law cap on damages can replace federal maritime law, and in both cases, the courts have found that the state laws conflicted with federal law and therefore were not applicable. *See Pike v. Woods Hole Oceanographic Inst.*, 233 F. Supp. 2d 198, 199 (D. Mass. 2002) (concluding that the Jones Act prevented the application of Massachusett's cap on recovery against a charitable organization); *Zagklara v. Sprague Energy Corp*, 919 F. Supp. 2d 163, 168 (D. Me. 2013) (relying on *Pike* to find that Maine's wrongful death statute capping damages for loss of consortium and emotional distress conflicted with general maritime law).

Neither case is precisely on point, however, and defendants urge the court to follow instead the decision of the Maryland Circuit Court in *McCoy v. Weeks Marine*, 2009 WL 3275927, 2009 A.M.C. 1862 (Md. Cir. Ct. July 8, 2009). In *McCoy*, the court did not focus on the issue of whether section 11-108 prejudices a characteristic feature of the general maritime law,[2] concluding instead that, because the cap imposed by section 11-108 "is uniform in its applicability to all personal injury actions in Maryland, . . . is not uncommon among the States, . . . is applied only to damages least quantifiable and most subject to jury inflation, and is set high enough to compensate most injured victims for their noneconomic damages," it was not

---

[2] The court in *McCoy* did not directly address whether a state law cap on damages conflicted with a maritime plaintiff's right to recover damages calculated on an individualized, fact-specific basis. Instead, the court observed that "[t]he parties have not contended, and this Court has found no support, that recovering exorbitant noneconomic damage awards is a characteristic feature of maritime law." *Id.* at 1882.

displaced by federal maritime law.  *Id.* at 1881-82.  I appreciate the reasoning in *McCoy* but respectfully disagree for the reasons explained below.

Here, as noted, the general maritime law on pain and suffering establishes that the damages to be awarded in a particular case "depend[] heavily" on the facts of that case. *Hernandez*, 841 F.2d at 590-91.  According to defendants, however, because general maritime law is silent on the issue of a cap on damages—that is, maritime law neither expressly prohibits a limit on damages nor imposes a superior cap—a gap exists that section 11-108 may fill.  But maritime law's silence on the issue of a cap is not the same as the absence of any general maritime rule on the appropriate way to calculate pain and suffering damages.  Although federal maritime law does not provide a uniform formula for estimating an award, or suggest a guideline range for fact-finders, it still establishes the appropriate measure of noneconomic damages: an amount that conforms with the fact-finder's observation of the plaintiff and fully compensates her losses based on the facts of her case.  *See id.*  As a result, by requiring an individualized finding of the amount of pain and suffering damages in each case, federal maritime law rejects the conclusion reached by the Maryland legislature regarding what constitutes "exorbitant" and what specific amount establishes an appropriate ceiling.  In other words, maritime law accepts— as Maryland law does not—that a fact-finder reasonably may conclude that a plaintiff's pain and suffering damages may exceed $695,000 in some cases.  In this way, maritime law supplies a rule of decision that conflicts with section 11-108's absolute cap on noneconomic damages.

Additionally, the purpose and spirit of general maritime law militate against the type of state law interference rendered by section 11-108.  Specifically, courts have proven most willing to permit state-law supplementation that expands, rather than restricts, general maritime remedies.  *See Yamaha*, 516 U.S. at 214-15  (permitting parents of girl killed in jet-ski accident

to recover nonpecuniary damages under state wrongful death law and explaining that the more

limited federal maritime remedy created by the Court in *Moragne v. State Marine Lines*, 398

U.S. 375 (1970)—which only permitted recovery of funeral expenses—did not displace state

law); *Sun Ship v. Pennsylvania*, 447 U.S. 715, 724 (1990) (concluding that state's remedial

scheme might permissibly be "more generous than federal law" because Congress indicated no

concern about "a disparity between adequate federal benefits and *superior* state benefits")

(emphasis in original)).  In these cases, courts have emphasized the "humane and liberal"

purpose of general maritime law, while invoking the Supreme Court's admonition to treat

various general maritime remedies as a floor, not a ceiling.[3]  *See, e.g.*, *Greene*, 466 F.2d at 167;

*Rogers v. Coastal Towing, L.L.C.,* 723 F. Supp. 2d 929, 936 (E.D. La. 2010) (finding that general

maritime law displaced Louisiana's Professional Rescuer's Doctrine because state rule undercut

liberal and humane purposes of law of salvage).

    Here—mindful that federal courts view superior state remedies with less suspicion than

those limiting a plaintiff's recovery—I conclude that, because section 11-108 reduces the remedy

available under section 905(b), Maryland's cap on damages prejudices the application of federal

maritime law.  Accordingly, section 11-108 may not be applied to Price's claim.

### C.  Uniform Application of General Maritime Law

    According to Price, even if section 11-108 does not prejudice a characteristic feature of

the general maritime law, it interferes with maritime law's uniform application.  Although

Congress delegated the elements of a section 905(b) action to the federal courts to be worked out

"through the application of accepted principles of tort law and the ordinary process of litigation,"

it nevertheless clarified that section 905(b) was to develop as a matter of uniform federal

---

[3] This view of the proper dynamic between federal maritime and state law is perhaps what the court in *Zagklara* had in mind when it observed that Maine's cap on noneconomic damages did not supplement plaintiff's maritime claims "as contemplated under *Yamaha*."  919 F. Supp. 2d at 168.

maritime law rather than as a piecemeal amalgamation of state tort law.  H.R. Rep. No. 92-1441.

Moreover, although the amount of an award for pain and suffering under section 905(b) may

fluctuate from case to case, the rule itself—that is, the requirement of an individualized and fact-

specific evaluation of a plaintiff case—is uniformly applied.  Because Maryland's cap on

damages would disrupt this uniformity, and because supplementing section 905(b) with section

11-108 would initiate the sort of state law amalgamation that Congress specifically discouraged

in the context of a section 905(b) claim, I find that section 11-108 interferes with the uniform

application of federal maritime law and should not be applied in this case.

Accordingly, defendants' motion for partial summary judgment will be denied.

## II. ARRC's Duty to Price Under Section 905(b)

Separate from defendants' collective attempt to cap Price's noneconomic damages,

ARRC moves for summary judgment.  Specifically, ARRC argues that its role aboard the Valga

did not give rise to a duty of care toward Price under section 905(b) because (1) ARRC's

representatives actively controlled neither the area of the Valga where Price was injured nor the

details of the cargo unloading operation, and (2) ARRC employees did not witness the

stevedores or crew members behaving in a manner that was obviously improvident.

The LHWCA governs the "tripartite legal triangle" among a vessel, an independent

stevedoring contractor, and an injured longshoreman employed by the stevedore.  Specifically,

the statute creates a comprehensive federal workers' compensation scheme that provides

longshoremen and their families with medical, disability, and survivor benefits for work-related

injuries, regardless of fault.  33 U.S.C. § 901, *et seq.*  In exchange, the LHWCA shields an

employer—usually, the stevedore—from additional liability to employees, provided that the

employer makes the required statutory payments.  *See Howlett v. Birkdale Shipping Co.*, 512

U.S. 92, 96 (1994). Although employees are thus barred from suing their employers in tort, the LHWCA permits a longshoreman to sue negligent third parties without relinquishing his right to statutory compensation from his employer. Under section 905(b), a longshoreman may seek tort damages against the vessel, while section 933 provides for negligence actions against all other third parties. The term "vessel" extends beyond the literal ship on which a longshoreman is injured to include a ship's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member. 33 U.S.C. § 902(21).

A product of the 1972 Amendments to the LHWCA, which abolished a vessel's strict liability for injuries suffered onboard, section 905(b) reflected Congress's intent "to shift more of the responsibility for compensating injured longshoreman to the party best able to prevent injuries: the stevedore-employer." *Howlett*, 512 U.S. at 97. With statutory, no-fault compensation payments intended as the primary means of making an injured longshoreman whole, courts repeatedly have urged restraint in "defining the contours of the [longshoreman's] action for negligence against the ship . . . lest too expansive notions of the ship's duty vitiate Congress' intent to do away with the absolute liability for vessels . . . ." *Gravatt*, 226 F.3d at 118 (citation omitted); *see also Carpenter v. Universal Star Shipping, S.A.*, 924 F.2d 1539, 1543 (9th Cir. 1991) (noting that if courts interpreted section 905(b) to impose liability on a vessel owner for the negligence of the stevedore, the LHWCA would become a vehicle for longshoremen to "put all costs on the party who is least able to avoid the accident . . . [and would] completely eliminate the incentive to act with caution of the party who is in the best position to avoid the accident, the stevedore"). Beyond communicating this intent, however, Congress did not "specify the acts or omissions of the vessel that would constitute negligence." *Gravatt*, 226 F.3d at 117. Instead, as previously discussed, it relegated the elements of a section 905(b) action to

the federal courts, to be worked out "through the application of accepted principles of tort law and the ordinary process of litigation." *Id.* (quoting H.R. Rep. No. 92-1441).

Presumably with this statutory history in mind, the Supreme Court in *Scindia* and *Howlett* outlined three potential duties owed by the vessel to a longshoreman who boards a ship to load or unload cargo. Although reasoning that vessels should not be subjected to lawsuits for "injuries that could be so anticipated and prevented by a competent stevedore," the Court nevertheless found vessels to be bound by three narrow duties of care: (1) the turnover duty, (2) the active control duty, and (3) the duty to intervene. *See Howlett*, 512 U.S. at 97-98; *Scindia*, 451 U.S. at 166-78. Each relates to the condition of the ship at a different stage in the cargo process: the turnover duty involves the state of the ship and its equipment upon the commencement of stevedoring operations, the active control duty arises once stevedoring operations have begun, and the duty to intervene applies in areas under the principal control of an independent stevedore. *Howlett*, 512 U.S. at 98.

Although a passive vessel owner has no ongoing duty to supervise or inspect a stevedore's work, once the stevedores board the ship and begin to discharge cargo, a vessel is potentially subject to the "active control duty" and the "duty to intervene."[4] Under the active control duty, a vessel may be held liable either for its active control of the cargo operations or for its active control of a specific area on a ship. The active control duty thus implicates both (1) a vessel that actively involves itself in the cargo operations and negligently injures a longshore worker in the process and (2) a vessel that fails to prevent unreasonable hazards in the areas of the ship under its direct control. Under the duty to intervene, a vessel may have a duty to intervene with respect to obvious dangers, even in areas of the ship where the stevedore—not the vessel—exercises direct control, and even when the vessel does not create a hazardous condition.

---

[4] Price does not claim a violation of the turnover duty.

14

Specifically, a vessel has such a duty when it obtains actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk.  *See Scindia*, 451 U.S. at 175-76.

Here, Price argues that ARRC both actively controlled aspects of the stevedoring operations and had a duty to intervene when the workers began to operate the forklift in an allegedly dangerous manner because ARRC's representative aboard the Valga was responsible for finding the vessel's cargoes, appointing stevedores, and coordinating the discharge process with the harbor workers and crew.  In response, ARRC argues that, as the commercial manager of the ship, it exercised no control over either the operational details of the cargo process, or over the actual area of the Valga where the injury occurred.  Moreover, because no ARRC representative was present on deck at the time of the accident, ARRC maintains that it had no obligation to intervene in the stevedore's work.  ARRC therefore contends that it cannot be held liable under section 905(b).  For the following reasons, I agree with ARRC.[5]

### A.  Duty Under Ship Management Agreement

Section 3.3 of ARRC's agreement with Mos requires the commercial manager to seek and negotiate employment for the Valga, issue voyage instructions, and appoint stevedores. (Shannon Decl. Ex. 1, Management Agreement 11, ECF No. 74.)  The agreement, however, also expressly exempts ARRC from the technical management of the vessel and crew.  According to the agreement, technical management involves: providing competent personnel to supervise the maintenance and general efficiency of the Valga; arranging and supervising dry dockings, repairs, and upkeep of the vessel; developing, implementing and maintaining a Safety Management System; and training and supervising the crew's efficiency.  (*Id.*)

---

[5] Although ARRC does not own the Valga or operate its crew, it still may be liable as a "vessel" under section 905(b).  The court will assume without deciding that the scope of ARRC's duties are governed both by its contract with Mos and by the duties imposed on a vessel under *Scindia*.

Price's accident occurred outside of ARRC's contractual sphere of responsibility.  Price's injury occurred during ongoing cargo operations, while he and another stevedore were operating forklifts around an open hatch.  The accident was not related to ARRC's negotiation of the vessel's employment, to its initial planning of the voyage's timing, or to its hiring of Beacon as the operation's stevedores.  ARRC completed these tasks long before cargo operations commenced aboard the Valga.  Instead, the accident—which allegedly occurred because of a combination of unresolved fluid on the decks, an unsupervised elevator hatch, a defective forklift, and the absence of needed safety equipment—falls within the "technical management" sphere, relegated to the owner and crew of the Valga.  (*See id.* at 6-15.)  Consequently, ARRC owes no duty to Price arising from its management agreement with Mos.

### B.  Active Control Duty

Price argues that ARRC owed him a duty under *Scindia*.  Specifically, Price argues that, because ARRC's representative, Belyakov, had the power to stop operations or make changes dictated by safety-related concerns, he assumed responsibility for the safety of operations aboard the Valga.  Price thus contends that ARRC actively controlled the stevedores' operations and may be liable under section 905(b).  ARRC counters that, because Belyakov did not control the Valga's crew, manage the ship's tween deck, or direct the stevedore's discharge operation, it did not exercise "active control" under *Scindia*.  I agree with ARRC.

As noted, once stevedoring operations begin, "a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" *Howlett*, 512 U.S. at 98 (quoting *Scindia*, 451 U.S. at 167).  The active control duty thus recognizes that—absent contractual, regulatory, or customary obligations to the contrary—a vessel continues to be responsible for areas or equipment over which the vessel's crew retains

operational control even if that vessel no longer retains primary responsibility for safety in a work area controlled by an independent stevedore.  *See England v. Reinauer Transp. Companies, L.P.*, 194 F.3d 265, 272-73 (1st Cir. 1999).  That said, "the mere presence of [vessel personnel] during the cargo operations is not sufficient to implicate the 'active control' duty."  *Capers v. Columbia Coastal Transport, Inc.*, 278 F. Supp. 2d 713, 718 (citing *Bonds v. Mortensen and Lange*, 717 F.2d 123, 127 n.4 (4th Cir. 1983)).  Similarly, even where a vessel plans some limited aspect of a cargo operation—such as a stowage plan for storing cargo—involvement at that level may not constitute active control under *Scindia.  See, e.g.*, *Sobrino-Barrera v. Anderson Shipping Co.*, 495 F. App'x 430, 434 (5th Cir. 2012) (unpublished) (concluding that vessel had not exercised active control over operations despite drafting the details of the stowage plan because it did not actually direct the manner in which cargo was unloaded or participate in unloading process).[6]  Instead, an injured longshoreman must demonstrate either "active control by the vessel over the actual methods and operative details" of the stevedore's work, or control over the area or equipment aboard the vessel.  *Clay v. Daiichi Shipping*, 74 F. Supp. 2d 665, 673 (E.D. La. 1999).  Here, Price must demonstrate that ARRC substantially controlled:  (1) the tween deck of the Valga and the elevator lift to the lower deck, (2) the forklift with the faulty brakes that fell through the hatch and struck Price, or (3) the stevedores' cargo process.  Price cannot show any of the above.

As port captain, ARRC's representative Belyakov did not substantially control any of the operations.  Belyakov testified that his responsibilities included checking the cargo before loading and unloading, and organizing the cargo procedures.  (Belyakov Dep. 14:21, 15:1-8.)  According to Belyakov, as a matter of routine, he would communicate with the stevedores regarding the volume of cargo and the number of stevedores necessary to complete the operation.

---

[6] Unpublished cases are cited not as precedent but for the soundness of their reasoning.

(*Id.*)  But he denied any control over the crew members on the ship during the cargo processes, explaining that the ship's captain directed all matters relating to the crew.  (*Id.* at 16:1-6.) During typical operations, Belyakov divided his time between the ship and the shore, but testified that, when aboard the vessel, he would spend his time in his cabin using his computer, not on the decks supervising the stevedores.  Belyakov was not on the decks on the date of the accident, and he did not witness what occurred.  (*Id.* at 32:1-8.)  When the forklift struck Price and crew members subsequently identified leaking hydraulic fluid as a possible cause, Belyakov was not the first person notified.  Belyakov testified that neither the crew nor the stevedores directly informed him about the accident, or about the fluid on the deck; he was later indirectly informed by the ship's captain after the crew and stevedores had assessed the situation.  (*Id.*)

Moreover, according to Price and Nichols, the stevedores retained full operational control over the various forklifts used to load and unload cargo on the Valga.  Not only did Beacon provide the forklifts for their employees' use, but the stevedores communicated informally among themselves in assigning each other's equipment and tasks.  (Nichols Dep. 47:1-22, 48:1-22, 49:1-14.)  Similarly, Price, Nichols, and Nosov all agree that Nosov—a member of the Valga's crew employed by Mos. Shipping—retained full operational control over the elevator lift and its hatch.  (Price Dep. 51:2-10.)  Price and Nosov also agree that Nosov directed the stevedores about when to load and unload the cargo on the lift, and generally observed the stevedores in both the hold and on the tween deck as they conducted operations.  (*See id.*) Although the parties disagree over whether this signifies that Nosov—and thus, the owner and operator of the Valga—exercised "active control" over the cargo operations and the area or equipment of the vessel where the accident occurred,[7] neither Price nor Nosov (nor Nichols, for

---

[7] Both parties spend a considerable portion of their briefings discussing the implications of Nosov's role in the accident.  Because Nosov originally testified—at his deposition, aided by a translator—that he was employed by

that matter) contend that Belyakov or any ARRC representative was present, or involved, in the "on the ground" details of this process.

Price correctly observes that Belyakov and ARRC did retain some control over the safety of the cargo operations aboard the Valga. Specifically, Belyakov acknowledged that, if informed of a sufficient safety hazard, he had the authority to shut down the discharge operation in concert with the stevedores and crew. (Belyakov Dep. 35:2-10 ("[W]e inform the foreman, the stevedores, and depending on the volume of leaks and equipment involved, we make a decision about . . . halting the operation.").) But this level of oversight, which is several degrees removed from the logistics of the operation, does not satisfy the requirements of the "active control duty" under *Scindia* and *Howlett*. Moreover, Price overstates Belyakov's (and thus, ARRC's) authority to stop cargo operations in the event of hazardous conditions. Belyakov's testimony is not that he had unilateral power to stop operations, or that he exercised final say in the matter. Rather, he testified that he could make a decision to stop work due to safety concerns only after consulting with the stevedores and crew members. There is no evidence that Belyakov or ARRC

---

ARRC, Price argues ARRC may be liable for Nosov's actions aboard the Valga. As ARRC correctly points out, however, Nosov subsequently clarified for the record that he was not, in fact, employed by ARRC and had no formal affiliation with the charterer; he was instead employed by Mos Shipping and thus was a member of the Valga's crew. (Nosov Decl. ¶ 4, ECF No. 91-1.) Because ARRC's motion for summary judgment concerns only its own liability to Price as a charterer—and does not raise Mos Shipping's prospective liability as the vessel owner—it is sufficient to note that Nosov was a member of the crew, and that the only ARRC personnel implicated in Price's accident was Belyakov. This motion, therefore, is properly analyzed with respect to duties incurred by Belyakov and ARRC only.

ARRC, however, argues that Nosov incurred neither the active control duty, nor the duty to intervene, because the stevedores controlled the cargo operations and were acting in a "professional" manner. I disagree. Nosov controlled the elevator lift and as a result, controlled whether there was an open hatch between the hold and the tween deck. Similarly, because he instructed stevedores on when, and how, to arrange cargo on the lift, he controlled whether Price was exposed to hazardous activity on the upper deck. Moreover, although the speed at which Nichols controlled the forklift may have been "professional," as Nosov testified, there is a factual question regarding whether the speed of the forklift, combined with its close proximity to the open hatch and visible fluid on the deck, would have rendered these actions "obviously improvident." As a result, the broader finding with respect to Nosov's liability that is urged by ARRC is not supported by the evidence. That said, because I am satisfied that Nosov was not employed by ARRC, ARRC's alleged duty to Price under section 905(b) is assessed solely with respect to Belyakov.

ever exercised this power, or became involved in the logistics of the Valga's or Beacon stevedores' safety procedures.

Also revealing is what Price does not allege.  Price does not allege that Belyakov directly supervised the stevedore's work or directly controlled the unloading operation as it was taking place; that ARRC provided or controlled the forklifts used, or that ARRC controlled the areas of the ship where the accident occurred; or that Belyakov, or any other ARRC representative, was present on the tween deck or in the hold when Price was injured.

Consequently, in light of the case law on this issue, and remaining cognizant of Congress's intent to limit the liability of a vessel under the LHWCA, I conclude that ARRC's influence over the Valga's safety procedures was too remote to constitute "active control" under *Scindia* and its progeny.  Accordingly, summary judgment is appropriate on this issue.

### C.  Duty to Intervene

Price also argues Belyakov had a duty to intervene in the cargo operations once the dangerous condition—namely, Nichols' needlessly fast operation of a forklift with defective brakes, around an open hatch without proper guardrails, on a deck wet with leaking hydraulic fluid—arose.  ARRC argues it incurred no duty to intervene with respect to Price because Belyakov did not witness Nichols using the forklift and had no knowledge of the faulty brakes or leaking hydraulic fluid, and because the alleged absence of guardrails did not render the stevedores' action obviously improvident.[8]  Again, I agree with ARRC.

Although a vessel owes no general duty to supervise or inspect cargo operations assigned to the stevedore in order to discover dangerous conditions—the vessel may rely on the stevedore to avoid exposing longshoremen to unreasonable hazards—in some circumstances it is not reasonable for the vessel to assume that the stevedore will remedy a problem.  *Scindia*, 451 U.S.

---

[8] The implications of Price and ARRC's arguments regarding Nosov are discussed above.  *See supra* note 3.

at 175.  As a result, the vessel may have a duty to intervene when the vessel has knowledge that "the stevedore's judgment in carrying out his tasks is 'obviously improvident.'"  *Bonds*, 717 F.2d at 127 (quoting *Scindia*, 451 U.S. at 175-76).  The "duty to intervene" thus requires the vessel to obtain actual knowledge that both: (1) a hazardous condition exists and (2) the stevedore, in the exercise of obviously improvident judgment, intends to continue to work in spite of that condition.  *Gay v. Barge 266*, 915 F.2d 1007, 1012 (5th Cir. 1990).  Because the vessel has a reasonable expectation that the stevedore will inspect and repair hazards, courts have thus repeatedly warned parties of the limited scope of the duty to intervene, categorizing it as a "narrow duty that 'requires something more than mere shipowner knowledge of a dangerous condition.'"  *Aguilar v. Bollinger Shipyards, Inc.*, 833 F. Supp. 2d 582, 592 (E.D. La. 2011) (quoting *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)).

Here, there is no evidence that ARRC knew: (1) that the deck was slippery, (2) that Nichols' forklift had faulty brakes, or (3) that Nichols was operating the forklift at a high rate of speed around the open elevator hatch.  In fact, Belyakov testified that he was not on the deck at the time of the accident, he did not witness Nichols operating the forklift, and he did not observe hydraulic liquid on the deck until after accident.  (Belyakov Dep. 18:16-20, 19:1-10.)  Price does not dispute any of this testimony.

Instead, Price's argument depends on Belyakov's reaction to the alleged lack of safety cones or guardrails around the lift.  Although Belyakov knew the crew and stevedores had not erected guardrails around the open hatch, this omission was part of the stevedores' and crew's normal and customary procedure, so as not to unnecessarily hinder the stevedores' ability to access the elevator lift and load and unload cargo on it.  (Belyakov Dep. 26:20-21, 27:1-17.) Because the danger posed by the lack of safety equipment around the open hatch was readily

apparent, Belyakov was entitled to rely on the stevedores' or Nosov's judgment about whether the cargo operations could be conducted safely unless the stevedores' decision to proceed without further precautions was obviously improvident.

Belyakov testified—and Price does not dispute—that the nature of the cargo operations dictated that the hatch remain open and unbarricaded while the stevedores worked in its vicinity. Because this was the normal practice of the stevedores and the Valga's crew, Belyakov could reasonably rely on those parties to remedy any dangerous situation.  Consequently, the decision to leave the hatch open and unbarricaded at the time of the accident was not "obviously improvident" so as to trigger a duty to intervene for Belyakov and ARRC.  *See Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1151 (7th Cir. 1992); *see also Bonds*, 717 F.2d at 127-28 (holding that stevedores' decision to continue unloading cargo with knowledge that gantry bell was malfunctioning did not trigger duty to intervene because "the longshoremen proceeded to unload the ship's cargo without complaint or incident until the time of the accident" and safe alternatives rendered stevedores' decision not obviously improvident); *Burns v. D. Oltmann Maritime PTE Ltd.*, 901 F. Supp. 203, 208 (E.D. Va. 1995) (surveying Fourth Circuit's decisions and concluding that "[t]he above cases suggest that only the most [eg]regious decisions by the stevedore are 'obviously improvident' and give rise to the shipowner's duty to intervene.").

Because Price has not demonstrated either of the required elements of a duty to intervene with respect to Belyakov—namely, actual knowledge and obviously improvident conduct on the part of the stevedore or crew—he cannot sustain his section 905(b) claim against ARRC. Accordingly, summary judgment will be granted on this issue.

### III. Defendants' Impleader of Rukert Under Rule 14(c)

Finally, defendants seek to implead Rukert under Rule 14(c), which, in this case, requires

a plaintiff to assert a maritime or admiralty claim within the meaning of Rule 9(h).  Fed. R. Civ.

P. 14(c).  Defendants argue Rule 14(c) was satisfied because Price stated in his complaint that his

was "an action under the General Maritime Law of the United States . . . ."  (Compl. 15, ECF

No. 2.)  Rukert argues otherwise, claiming Price failed to adequately designate his claim as an

admiralty or maritime claim under Rule 9(h).  I agree with Rukert.

Rule 14(c) provides that "[i]f a plaintiff asserts an admiralty or maritime claim under

Rule 9(h), the defendant . . . may, as a third-party plaintiff, bring in a third-party defendant who

may be wholly or partly liable" on account of the same transactions or occurrences.  Fed. R. Civ.

P. 14(c).  For defendants to validly implead Rukert as a third-party defendant under Rule 14(c),

then, requires that Price have asserted a claim within the meaning of Rule 9(h).  That Rule

provides, in relevant part:

> If a claim for relief is within the admiralty or maritime jurisdiction and also within
> the court's subject-matter jurisdiction on some other ground, the pleading may
> designate the claim as an admiralty or maritime claim for purposes of Rule[] 14(c)
> . . . .  A claim cognizable only in the admiralty or maritime jurisdiction is an
> admiralty or maritime claim for those purposes, whether or not so designated.

Fed. R. Civ. P. 9(h).  The Rule outlines an important distinction: while a plaintiff asserting a

claim within the court's exclusive admiralty jurisdiction automatically triggers Rule 14(c)

without any express designation, a plaintiff who asserts a claim cognizable in both an admiralty

and non-admiralty basis must make an affirmative designation—that is, some identifying

statement in his complaint or subsequent pleadings—before defendants may use Rule 14(c).[9]

*Compare Harrison v. Glendel Drilling Co.*, 679 F. Supp. 1413, 1418 (W.D. La. 1988) (noting

that specific identifying statement not needed if claim is cognizable only in admiralty), *with*

---

[9] Because the option of whether to proceed in admiralty carries with it "numerous and important consequences"—
including the right to a jury trial—the Rule 9(h) analysis focuses on the plaintiff, not the defendant.  *T.N.T. Marine
Services v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 586 (5th Cir. 1983).

*Bodden v. Osgood*, 879 F.2d 184, 186 (5th Cir. 1989) ("To invoke the admiralty jurisdiction, a plaintiff must insert a statement in his pleading identifying the claim 'as an admiralty or maritime claim for purposes of Rule[] 14(c) . . . .'" (quoting Fed. R. Civ. P. 9(h))), *and Banks v. Hanover S. S. Corp.*, 43 F.R.D. 374, 376-77 (D. Md. 1967) ("An allegation that the claim is within the admiralty and maritime *jurisdiction* does not *automatically* make it an admiralty and maritime *claim*, within the meaning of Rule 9(h), if the claim is also within the jurisdiction of the district court on some other ground.  A statement identifying the pleading as an admiralty and maritime *claim* is necessary." (emphasis in original)).[10]  Here, both sides agree—and I agree with their assessment—that Price's claim does not fall within the court's exclusive admiralty jurisdiction.  Accordingly, defendants' ability to implead Rukert under Rule 14(c) turns on whether Price sufficiently designated his claim as an admiralty or maritime claim within the meaning of Rule 9(h).

Although some disagreement exists on what constitutes an adequate Rule 9(h) designation, *see, e.g.*, *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 257 (3d Cir. 1998) ("Rule 9(h)'s use of the word 'may,' instead of 'must,' suggests that the specific use of the words 'Rule 9(h)' is not required. . . .  The question remains, however, just how specific a reference to admiralty jurisdiction must be in order to invoke it."), courts generally will consider the totality of the circumstances, which includes the plaintiff's pleadings and actions.  *See Bodden*, 879 F.2d at 186; *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 666 (7th Cir. 1998).  A plaintiff's demand for a jury trial, for instance, is inconsistent with an intent to proceed in admiralty.  *See Concordia Co., Inc. v. Panek*, 115 F.3d 67, 72 (1st Cir. 1997) (citing *Lewis v. United States*, 812

---

[10] A Rule 14(c) impleader differs from the traditional indemnity impleader available under Rule 14(a).  Specifically, a defendant who impleads a third-party under Rule 14(a) seeks to recover from the third-party on his own behalf. *See Lewis v. United States*, 816 F. Supp. 1097, 1100 (E.D. Va. 1993).  By tendering the third-party defendant to the plaintiff under Rule 14(c), the defendant presses the plaintiff's claim directly against the third-party, allowing the plaintiff to directly litigate against—and recover from—that third-party defendant. *Id.*

F. Supp. 620, 627 (E.D. Va. 1993)).  As another example, a plaintiff who files in state court and fails to object to defendant's removal on the basis of diversity does not invoke admiralty jurisdiction.  *See Bodden*, 879 F.2d at 186.

Here, considering the totality of the circumstances, Price did not designate his claim so as to invoke this court's admiralty jurisdiction.  As an initial matter, Price makes no direct reference to Rule 9(h).  While true that Price refers to "the General Maritime Law" in his prayer for relief, (Compl. 15), this is not enough.  *Cf. Teal v. Eagle Fleet, Inc.*, 933 F.2d 341, 345 (5th Cir. 1991) (finding Rule 9(h) designation when caption stated "Complaint within the Admiralty and Maritime Jurisdiction Pursuant to the General Maritime Law of the United States of America").

Even assuming Price's lone mention of admiralty law in the prayer for relief were a sufficient designation, the rest of Price's conduct belies an intent to proceed in admiralty.  Price filed his complaint in state court and did not categorize his claim as one in admiralty or maritime jurisdiction.  (Compl. Ex. 1, Civil Case Information Report, ECF No. 2-1.)  Nor did he assert a claim—such as an in rem claim against the Valga—cognizable only in admiralty.  Moreover, although defendants later removed Price's claim to this court on the basis of diversity, Price "failed to object to the basis for the jurisdiction or assert the existence of alternative jurisdiction based on his admiralty claim."  *Bodden*, 879 F.2d at 186; *see also Mike Evans Crane Services, Inc. v. Cashman Equipment Corp.*, 2:11-CV-01525, 2013 WL 789087, at *2-3 (E.D. La. Mar. 1, 2013) (denying defendant's effort to invoke Rule 14(c) where plaintiff filed complaint in state court, asserted claims that were maritime in nature, and failed to object to diversity as the basis for removal).  Perhaps most importantly, Price demanded a jury trial.  (Compl. Ex. 1, Civil Case Information Report.)  In seeking a procedure unavailable to plaintiffs proceeding in admiralty, Price could not reasonably be pressing an admiralty claim.  *See, e.g.*, *Bodden*, 879 F.2d at 186;

*Lewis*, 812 F. Supp. at 628 ("In this action, [plaintiff] *did* demand trial by jury which, of course, is inconsistent with an intent to proceed in admiralty." (emphasis in original)).[11]  Price did not make a sufficient designation under Rule 9(h).  Accordingly, defendants' attempt to implead Rukert under Rule 14(c) is improper.[12]

## CONCLUSION

For the aforementioned reasons, the pending motions will be granted in part and denied in part.  Specifically, ARRC's motion for summary judgment and Rukert's motion for partial summary judgement will be granted, and defendants' motion for partial summary judgment to apply Maryland's cap on noneconomic damages to Price's claim under § 905(b) will be denied.

A separate order follows.

<u>September 18, 2014</u>                          <u>          /S/          </u>
       Date                                   Catherine C. Blake
                                     United States District Judge

---

[11] Although defendants, citing the decision in *T.N.T. Marine*, contend that Rule 9(h) requires only a "statement identifying the claim as an admiralty or maritime claim for the purposes of Rule 14(c)" that was satisfied by Price's assertion of a claim under the general maritime law, I am persuaded that the relevant case law—embodied by the decisions in *Bodden* and  *Lewis*, among others—weighs in favor of the holistic analysis employed here.

[12] Defendants may still proceed with their own third-party action against Rukert for contribution or indemnity under Rule 14(a).